## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**WARREN OLIVER, DC# 781409,**

      **Plaintiff,**

**v.**                        **Case No.: 3:11-cv-964-J-37MCR**

**OFFICER HARDEN, et al.**

      **Defendants.**

_____/

### Defendants' Motion for Summary Judgment

Defendants, HARDEN, REDDISH, WOOD, SWAIN, and McLEMORE, by and through undersigned counsel, submit this Motion for Summary Judgment pursuant to Rule 56, Federal Rules of Civil Procedure.  Defendants request that judgment be entered in their favor and state as follows:

### PRELIMINARY STATEMENT

Plaintiff Warren Oliver ("Plaintiff") is a life-sentenced inmate in the custody of the Florida Department of Corrections, currently incarcerated at Florida State Prison in Raiford, Florida. [Defendants' Exhibit A - Inmate Population Information Detail.]

Defendant Reddish ("Reddish") is employed by the Florida Department of Corrections ("FDOC") and is the Warden of Lawtey Correctional Institution. [Defendants' Exhibit B – Reddish Declaration.]  Defendant Swain ("Swain") is a Captain employed by FDOC and assigned to Columbia Correctional Institution, located in Live Oak, Florida.  [Defendants' Exhibit C – Swain Declaration.[1]] Defendant McLemore ("McLemore") is a Correctional Officer

_____

[1] Defendant Swain was unable to execute his declaration prior to the filing of this motion.  A copy of the executed declaration will be filed with the Court when it is received by undersigned counsel.

Sergeant employed by FDOC whom is also assigned to Columbia Correctional Institution. Defendant Wood ("Wood") and Defendant Harden ("Harden") are both Correctional Officers employed by FDOC and are assigned to Union Correctional Institution, located in Raiford, Florida. [Defendants' Exhibit E- Wood Declaration and Defendants' Exhibit F- Harden Declaration.] On May 7, 2011, all of the Defendants were employed at Union Correctional Institution, located in Raiford, Florida.

Plaintiff filed this civil rights complaint pursuant to 42 U.S.C. § 1983, and is proceeding against Defendants Reddish, Swain, McLemore, Harden, and Wood ("Defendants" collectively,) solely in their individual capacity and is seeking compensatory and punitive damages in addition to injunctive relief based upon alleged violations of Plaintiff's rights under the Eighth Amendment. [Doc. 1, pg. 11, § VIII]  Plaintiff contends that the Defendants violated his Eighth Amendment Rights by being deliberately indifferent to a serious risk of harm.  These allegations stem from a violent altercation which occurred on May 7, 2011, between the Plaintiff and Inmate Robert Ohlin, DC #168092 ("Ohlin"), in the day-room of O-Dormitory at Union Correctional Institution.

The undisputed facts reflect that: Plaintiff was involved in a physical altercation with Ohlin because Plaintiff wanted to watch a Lady Gaga music video; Plaintiff never had any problems with Ohlin before that day; Plaintiff had been in the day-room with Ohlin prior to that day without incident; Plaintiff never expressed any safety concerns to any of the Defendants; none of the Defendants were present in the day-room at the time of the altercation; Plaintiff did not cry out to the Defendants for help during the altercation; Plaintiff was escorted to medical for treatment after the altercation; and Plaintiff cannot identify a single specific incident prior to his altercation which would potentially place anyone on notice that this altercation was likely to

occur. Accordingly, Plaintiff fails to state a claim for deliberate indifference against any Defendant.

## PLAINTIFF'S ALLEGATIONS

Generally, Plaintiff alleges that Defendants were deliberately indifferent to the substantial risk posed by the O-Dormitory day-room. [Doc. 1, pg. 8, §VI.] As Swain and Reddish were not present on the day in question when the incident occurred, Plaintiff is attempting to demonstrate their liability via their supervisory role. [Defendants' Exhibit G, pg. 67:7-68:8]

Specifically, Plaintiff alleges that Defendants McLemore, Wood, and Harden were aware of the excessive risk posed by an allegedly improperly supervised day-room of Close Management inmates, with a privacy screen outside the door, and restraints Plaintiff claims were inadequate, which they disregarded while escorting inmates back and forth. [Doc. 1, pg. 8-9.; Defendants' Exhibit G, pgs. 64:3-67:4.] Plaintiff alleges that both Reddish and Swain, through their supervisory role had knowledge of the risk to inmates' health and safety in the O-dormitory day-room due to "many complaints". [Doc. 1, pgs. 9-10.] Plaintiff claims that Reddish and Swain should have forbid the use of the privacy shield, had the inmates "fully restrained," and had the inmates constantly monitored after becoming aware of this risk, but did not. [Doc. 1, pg. 10; Defendants' Exhibit G, pg. 67:7-68:8]

## STATEMENT OF RULE 56 MATERIAL FACTS

All events pertinent to this case occurred in O-Dormitory of Union Correctional Institution (U.C.I) [Defendants' Exhibits B, C, D, E, F, and G, pg. 8:8-23.] The day-room where the incident took place is located on the second floor of O-Dormitory. [Defendants' Exhibits C, D, E, F, and G, pg. 10:21-12:1.] On May 7, 2011, Defendants Wood, Harden, McLemore, and an unnamed officer, later identified as Officer Alstatt, were escorting inmates to the day-room

located on the second floor of Union Correctional Institution's O-Dormitory. [Doc. 1, pg. 8, §VII; Defendants' Exhibits D, E, F, and G, pg. 10:21-23 and 36:21-37:4] Oliver and all other inmates attending day-room during the time the alleged incident occurred were Close Management (CM) inmates, which is a classification status containing three distinct levels for inmates with disciplinary problems. [Defendants' Exhibits B, C, D, E, F, and G, pgs. 12:13-13:14.] All inmates being escorted to the day-room that day were restrained with handcuffs behind their back, but were not shackled or further restrained. [Defendants' Exhibits B, C, D, E, F, and G, pgs. 34:23-35:4.] There was a screen placed outside the day-room door every time Plaintiff attended, which prevents inmates with a history of masturbating while staring at female staff from committing further violations directed at female staff members stationed in the control room.[2] [Defendants' Exhibits B, C, D, E, F, and G, pgs. 18:22-19:2; Defendants' Exhibit I.] The screen is positioned a few feet from the day-room door, at an angle. [Defendants' Exhibits B, C, D, E, F, and K] Notwithstanding the screen, staff members outside the control room can see in the day-room. [Defendants' Exhibits C, D, E, and F.] The day-room is routinely checked by security personnel in addition to the officer stationed on the Quarterdeck, but there was no officer stationed immediately outside the door, continuously peering into the room. [Defendants' Exhibits B,C,D,E,F, and J at (15)(a).] At the conclusion of the allotted time for day-room, inmates began to be transferred back to their cells. [Defendants' Exhibits D, F, and G, pg. 48:23-49:7.] During this period, one or two inmates are escorted back at a time. [Defendants' Exhibits G, pg. 35:9-19] One or two Officers escort each inmate. [Defendants' Exhibit G, pg. 35:9-19 and J at 14(b) and 14(d).] Each trip returning an inmate or inmates to their cell(s) takes mere minutes. [Defendants' Exhibits C, D, F, and G, pg. 44:4-46:13.] Inmate Robert Ohlin and the

---

[2] Plaintiff has received a total of eleven (11) disciplinary reports for Lewd and Lascivious Exhibition or Profane/Obscene Acts. [Defendants' Exhibit G, pgs. 87:23-93:14.; Defendants' Exhibit H.]

Plaintiff were the last two remaining in the room. [Defendants Exhibits D, E, F, L, G pg. 49:8-56:10.] An altercation between the two occurred because Plaintiff wanted to stay and watch a Lady Gaga video, while Inmate Ohlin wished to watch NASCAR.  [Defendants' Exhibits L and G  pg.  49:8-56:10]   Once  Defendants  McLemore,  Wood,  and  Harden  were  aware  of  the altercation, Plaintiff was escorted to medical. [Defendants' Exhibits D, E, F, and G, pg. 58:1-23; P]  Inmate Ohlin was given a disciplinary report. [Defendants' Exhibits D, E, F, G, pg. 35:5-10, and M.]

## I. Standard of Review

Summary judgment is proper if the pleadings and sworn statements show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corporation v. Catrett, 477 U.S. 317, 322-23 (1986).  The party moving for summary judgment bears the initial burden of demonstrating an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 323.  Upon meeting this burden, the burden shifts to the nonmoving party to present evidentiary material demonstrating that a genuine issue of material fact exists.  Id. at 324.

Applicable substantive law identifies those facts that are "material."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Factual issues must have a real basis in the record to be considered genuine and the nonmoving party must show more than a "metaphysical doubt" regarding the material facts.  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).   The evidence and reasonable inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party.  Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999).

Although all reasonable inferences are made in favor of the nonmoving party, a court need not permit a case to go to a jury when the inferences drawn from the evidence and upon

which the nonmoving party relies are "implausible." <u>Cuesta v. School Bd. of Miami-Dade County</u>, 285 F.3d 962, 970 (11th Cir. 2002) (citations omitted).   "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U. S. 372, 380 (2007).   A mere "scintilla" of evidence in support of the nonmoving party's position is not sufficient; there must be evidence upon which a jury could reasonably find for the nonmoving party.  <u>Anderson</u>, 477 U.S. at 252.  <u>See also</u> <u>Matsushita</u>, 475 U.S. at 587 (stating that there is no genuine issue for trial if record taken as a whole would not lead a rational trier of fact to find in favor of non-moving party); <u>Muhammad v. Sapp</u>, 494 Fed.Appx. 953, 958 (11th Cir. 2012).   In other words, summary judgment is warranted against a nonmoving party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.

## II. Plaintiff is not entitled to injunctive relief against Defendants.

Plaintiff seeks unspecified injunctive relief against Defendants in their *individual* capacity. (Doc. 1, pg. 12 §VIII.]  Presumably, Plaintiff is seeking to have the policies regarding the privacy screen, manner of restraint employed on CM Inmates, and the level of supervision within the day-room, altered.   Initially Defendants note that, as individuals, they cannot effectuate the relief Plaintiff is seeking. "[P]ersons from whom injunctive relief is sought must be parties to the underlying action." <u>Thompson v. Windsor</u>, slip copy, 2010 WL 3043427, *12 (N.D. Fla.)(citing <u>In re Infant Formula Antitrust Litigation, MDL 878 v. Abbott Laboratories</u>, 72 F.3d 842, 842-43 (11th Cir.1995) and <u>Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.</u>, 96 F.3d 1390, 1394 (5th Cir.1996) for the proposition that the district court was unable to grant temporary injunctive relief where the sole defendant correctional employee had no authority to effectuate the requested relief).

Even if Plaintiff properly sued the named Defendants in their Official Capacity in his complaint, the only Defendant who could have amended the protocol of the institution would be Reddish, the *former* Warden of Union Correctional Institution. However, because Reddish no longer works at Union Correctional Institution, he has no authority to modify the policy at that institution. Additionally, Plaintiff has been transferred to Florida State Prison and is, therefore, no longer incarcerated at a correctional institution where any of the Defendants in this action are employed and none of the Defendants would, therefore, have any means of altering a policy which would affect Plaintiff. "The general rule in our circuit is that a transfer or a release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief." Smith v. Allen, 502 F.3d 1255,1267 (11th Cir. 2007)(citing McKinnon v. Talladega County, 745 F.2d 1360, 1363 (11th Cir. 1984), and Zatler v. Wainwright, 802 F.2d 397, 399 (11th Cir. 1986)). "The reason for this rule is that injunctive relief is 'a prospective remedy, intended to prevent future injuries.'" Smith, 502 F.3d at 1267 (citation omitted). "Past exposure to illegal conduct does not constitute a present case or controversy involving injunctive relief if unaccompanied by any continuing, present adverse effects." Wahl v. McIver, 773 F.2d 1169, 1174 (11th Cir. 1985)(citing O'Shea v. Littleton, 414 U.S. 488, 495-96, 94 S. Ct. 669, 675-76, 38 [*1174] L. Ed. 2d 674 (1974)). Accordingly, any such claim for injunctive relief would be moot in this case.

### III.  Plaintiff fails to state a claim for failure to protect.

A prison official's failure to control or separate prisoners who endanger the physical safety of other prisoners, may constitute an Eighth Amendment deprivation. Smith v. Wade, 461 U.S. 30 (1983). Prison officials must take all reasonable precautions to protect inmates from known dangers. Id. Prison officials have a duty to protect prisoners from violence perpetuated

by other prisoners.  Farmer v. Brennan, 511 U.S. 825, 833, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994), *quoted in* Jensen v. Clarke, 73 F.3d 808, 810 (8th Cir.1996). Not every injury inflicted upon a prisoner at the hands of another prisoner amounts to liability of the prison officials.  Farmer, 511 U.S. at 834, 114 S.Ct. at 1977.

To demonstrate a violation of a prisoner's Eighth Amendment right to be protected, a Plaintiff must show that the official knew and recklessly disregarded "an excessive risk to inmate health or safety."  Id., 511 U.S. at 837, 114 S.Ct. at 1979.  The risk "must be an objectively substantial risk of harm." Cottone v. Jenne. 326 F.3d 1352, 1358 (11th Cir. 2003)(citations omitted).  Not only must the prison official know of the risk, but to be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a 'sufficiently culpable state of mind." Farmer, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; Wilson v. Seiter, 501 U.S. 294, 299, (1991).  Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists-and the prison official must also "draw that inference." Farmer, 511 U.S. at 837, 114 S.Ct. at 1979; Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003). "The known risk of injury must be a strong likelihood, rather than a mere possibility before a [correctional official's] failure to act can constitute deliberate indifference." Brown v. Hughes, 894 F. 2d 1533, 1537 (11th Cir. 1990)(citations and internal quotations omitted).  As the foregoing makes clear, "[m]erely negligent failure to protect an inmate ... does not justify liability under section 1983...." Id.

**A. Defendants had no knowledge of a substantial risk of serious harm.**

   **i.**      **Defendants McLemore, Harden, and Wood**

The record in this case reflects that Defendants had no actual foreknowledge that Plaintiff was in danger of serious harm. [Defendants' Exhibits D, E, and F.] In fact, Plaintiff's own deposition testimony verifies that Plaintiff never informed Defendants of any possibility that there might be an incident and further reflects that Plaintiff and inmate Ohlin had no problems with one another before the incident at issue, despite attending day-room several times together. [Exhibit G, pgs. 22:7-18; 61:7-62:3] Plaintiff has admitted that he was not on bad terms with inmate Ohlin prior to the assault, had never experienced any problems with him in the past, and the two of them were actually friendly when they talked. [Exhibit G, pg. 61:7-24.] In fact they had attended day-room in the past without issue. [Id.; Defendants' Exhibits E and F.] Further, Plaintiff has admitted that the assault was sudden and totally unexpected, so he never sought protection from the escorting officers. [Defendants' Exhibit G, pg. 61:16-62:3.] Plaintiff did not alert the officers or seek help during the altercation either. [Defendants' Exhibit G, pg. 55:9-21] A correctional officer is not the guarantor of a prisoner's safety. Purcell v. Toombs County, GA., 400 F.3d 1313, 1322 (11th Cir. 2005.) Plaintiff alleges that Ohlin attacked him for refusing to change the channel on the television in the day-room to a NASCAR event, while Plaintiff wanted to watch a Lady Gaga music video. [Defendants' Exhibit G, pg. 49:8-50:11.] Similarly, Ohlin has stated in his declaration (executed nearly eight months prior to Plaintiff's deposition) that he merely acted in self-defense when Plaintiff attacked him for refusing to be the next inmate to leave the day-room so Plaintiff could finish watching a Lady Gaga video. [Defendants' Exhibit L.] In short, Plaintiff has failed to provide even a "scintilla" of evidence that the Defendants had any prior knowledge that Plaintiff was at any risk of harm, because the incident occurred

spontaneously without any warning, and Plaintiff's deliberate indifference claim necessarily fails. Cf. Anderson, 477 U.S. at 252

To the extent Plaintiff's alleges that inmate Ohlin had a history of violent behavior which is sufficient to create the requisite subjective knowledge to state a claim for deliberate indifference, he is mistaken.  See Carter, 352 F.3d at 1349 (holding that mere awareness by the defendant of an inmate's problematic nature does not rise to a sufficient level of culpability to satisfy the subjective awareness requirement); Brown, 894 F.2d at 1537 (risk of injury must be more than "mere possibility" to satisfy the subjective requirement).  In fact, even if the law of this circuit wasn't directly contrary to Plaintiff's position, and the Defendants had reviewed Ohlin's Classification File prior to the incident, which they did not, the record would still not support the proposition that the Defendants knew Plaintiff was in any danger based upon inmate Ohlin's violent history, because the record reflects that inmate Ohlin and Oliver had the same number of disciplinary reports for violent altercations with other inmates.[3]  [Defendants' Exhibits D, E, F, N, and O.]  Accordingly, Plaintiff cannot satisfy the subjective knowledge requirement of Farmer and cannot maintain a claim for deliberate indifference against any Defendant.

To the extent Plaintiff asserts Defendants were aware of a substantial risk of serious harm because there were numerous incidents of inmates assaulting one another in the day-room as a result of insufficient restraints, routine security restraints and the presence of a white screen in front of the day-room, there is absolutely no evidence to support this claim.  Plaintiff's deposition testimony reveals that he has no first-hand knowledge of any such incidents, but "knows" about them because unnamed inmates have told him these types of incidents have

_____

[3] This figure only counts the May 7, 2011, incident against Ohlin, because Plaintiff was not issued a disciplinary report.

happened.   [Defendant's Exhibit G, pgs. 68:9-70:15]   Similarly, Plaintiff has no first-hand knowledge of any complaints or grievances regarding any such incidents, but "knows" about them because unnamed inmates have told him these types of complaints or grievances have been filed.[Id.] Cf. LaMarca v. Turner, 995 F.2d 1526 (11th Cir. 1993)(the plaintiffs presented incident reports, internal staff reports, and reports by external investigators each supporting a finding that Turner knew that an unreasonable risk of violence existed at GCI and knew of alternative means that would have brought that risk to within constitutional norms.)   To the contrary, altercations do not occur frequently in the O-Dormitory day-room because inmates want to maintain that privilege. [Defendants' Exhibits D, E, and F] This is especially true for CMII inmates because they don't want to be elevated to CMI placement, which is the most restrictive classification status. [Id.; Defendants' Exhibit J] Plaintiff's conclusory hearsay testimony is insufficient to demonstrate the existence of incidents sufficient to put Defendants on notice of a widespread problem sufficient to satisfy the subjective knowledge aspect of deliberate indifference.

A white screen is placed between the day-room and the officer's station only when a female staff member is working in the officer's station[4] and one of the inmates present in the day-room has a history of masturbating while leering at female staff.  [Defendants' Exhibits B, C, D, E, F, and I.]  The screen is placed away from the door of the day-room to prevent inmates from defacing or tampering with the screen and angled to allow staff conducting security checks, and stationed on the quarterdeck, to see into the day-room.  [Defendants' Exhibits C, D, E, and F.]  This practice began in approximately April of 2009, after female staff members successfully brought several Title VII sexual harassment lawsuits against the Department for failure to shield female staff from this type of behavior.  [Defendants' Exhibits C, D, I and R.]  The white screen

---

[4]Plaintiff confirmed the presence of female staff in the control room during his deposition. [Defendants' Exhibit G, pg. 37:16-20.]

was appropriately in place on the date of the incident, as there was a woman working in the officer's station and Plaintiff's disciplinary record included eleven disciplinary reports for masturbating while staring at female staff.  [Exhibit G, pgs. 87:23-93:14; H, and I]  To the extent Plaintiff asserts the presence of the screen was causing frequent assaults to occur in the O-dormitory day-room, he is once again incorrect. A review of all of the disciplinary reports involving inmate-on-inmate violence from Union Correctional Institution since 2009 reflects that a maximum of five disciplinary reports were issued as result of inmate-on-inmate violence occurring in O-dormitory's day-room.[5] [Defendants' Exhibit Q]  More importantly, *none* of the inmates involved in any of those incidents filed grievances blaming the incident on the presence of a white screen, insufficient restraints, or improper supervision.  [Id.]

With regard to inmate restraints during day-room time, there is no Department rule, policy, or procedure which requires inmates in the day-room to be "fully restrained" at all times. [Exhibits B, C, D, E, F, and J at 11(c)3. and 14(b).]  .] In the absence of a documented reason for additional restraints, inmates in the day-room may be restrained by handcuffing them behind their backs.  [Id.]  In fact, the applicable rule actually provides that a senior correctional officer can authorize inmates to be completely unrestrained within the day room.  [Id.] Plaintiff's deposition testimony reflects that both he and inmate Ohlin were handcuffed behind their backs while in the day-room.  [Defendants' Exhibit G, pg 34:23-35:4.]  Similarly, there is no requirement that security staff be positioned directly outside of the day-room at all times. [Defendants' Exhibits B, C, D, E, F, and J at 15(a).]  Security staff is stationed on the

---

[5]One of the reports, disciplinary report log# 213-110562, states that the altercation occurred in the "Mental Health Pavillion," but continues that the charging officer observed the inmates "on the group room floor." Additionally, DR log #213-110462 and DR log #213-110461 do not state where the incident occurred. Due to the fact that a water hose was apparently involved, the likelihood of the incident occurring in the day-room is extremely thin. Notwithstanding these facts, these reports were included in the figure in an abundance of caution.

quarterdeck during day-room activities unless other duties require their presence elsewhere, and security checks of the quarterdeck occur *at least* once every thirty minutes regardless. [Defendants' Exhibits C, D, E, F, and J at 14(b).] See Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995)(evidence that jailer failed check on group cell during hour between last check and beating was not sufficient to show deliberate indifference and causation to hold jailer individually liable.); see also Purcell v. Toombs County, GA., 400 F.3d 1313, 1323 n. 23 (11th Cir.1990)("The Constitution does not require that every inmate in a jail be observed by a guard every twenty minutes."); see also Popham v. City of Talladega, 908 F.2d 1561, 1565 (11th Cir. 1990)(the proposition that deliberate indifference is demonstrated if prisoners are not seen by jailers at all times is unfounded.) Plaintiff's argument is further weakened because at the time he was assaulted, Officers were in the process of escorting inmates from the day-room to their cells. [Defendants' Exhibit G, pgs. 45:16-50:12.] Usually, escorting an inmate from the day-room to his cell and securing him takes a matter of minutes. [Id.; Defendants' Exhibits D, E, and F.] As discussed above, and contrary to Plaintiff's unsupported conclusory allegations, there was no significant evidence, in the form of incidents or complaints regarding this issue, to put Defendants on notice that Plaintiff could somehow be in danger based upon the standard practices of Union C.I. or the Florida Department of Corrections as it pertains to the situation Plaintiff was in on May 7, 2011. [Defendants' Exhibits B, C, D, E, F, and Q.] Accordingly, Plaintiff cannot demonstrate deliberate indifference on the part of any Defendant.

### ii. Defendants Reddish and Swain

Supervisory officials are not liable under section 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability. See Cottone, 326 F.3d at 1360. A supervisor can be held liable for the actions of his subordinates under § 1983 if he personally participates in the act that causes the constitutional violation or where there is a

causal connection between his actions and the constitutional violation that his subordinates commit. Braddy v. Fla. Dep't of Labor and Emp't Sec., 133 F.3d 797, 802 (11th Cir. 1998). A causal connection can be established if a supervisor had the ability to prevent or stop a known constitutional violation by exercising his supervisory authority and he fails to do so. Keating v. City of Miami, 598 F.3d 753, 765 (11th Cir. 2010). The knowledge requirement is a subjective test. *See* Cottone, supra.

As explained in Section A. i., supra, Plaintiff has not provided *any* evidence demonstrating that Reddish or Swain had any reason to believe that the day-room in O-Dormitory was a high- risk area due to the utilization of a privacy screen, the manner in which inmates were restrained, or the routine security checks. In his complaint, Plaintiff charges Swain with knowledge of the risk in conclusory fashion because he worked as a shift supervisor. [Doc. 1, pg. 9.] Plaintiff also claims that Reddish should have changed policy in the face of "many complaints" that Reddish has received and/or reviewed. [Doc. 1, pg. 10.]   When asked by Defendants' counsel during his deposition for the identity of any complaining inmate or how Plaintiff had any personal knowledge of these complaints, he could not provide a valid answer. [Defendant's Exhibit G, pgs. 68:9-70:15.] By Plaintiff's own admission, any knowledge he has of abuse or complaints of abuse occurring in the day-room is based *solely* on the word of another inmate or other inmates. [Id.] Plaintiff has not himself seen any incidences of abuse or violence in the O-Dormitory day-room, nor actually seen any related grievance filed by any inmate prior to the incident forming the basis of the instant action, and therefore has obviously not provided any evidence to the Court.[6] [Id.] Plaintiff has failed to allege facts showing a history of violent

---

[6] In addition to having no actual, personal knowledge of any incidents or grievances filed regarding alleged incidents in the day-room, Plaintiff cannot name or meaningfully identify any of the inmates that told him they were involved in incidents or filed grievances regarding potential risks posed by the day-room which implicated the privacy screens, the manner in which

incidents, and a conclusory assertion that violent assaults commonly happen in the day-room of O-Dormitory is insufficient to put either Reddish or Swain on notice of ongoing constitutional violations. Doe v. School Bd. of Broward Cnty., Fla., 604 F.3d 1248, 1266 (11th Cir. 2010). Furthermore, Plaintiff does not allege any facts that would establish that violent altercations occurring in the O-Dormitory day-room at UCI were "obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.1990), cert. denied, 500 U.S. 933 (1991). Additionally, there were no documents implicating the privacy screen, the method of restraint, or routine security checks as problematic. [Defendants' Exhibit Q.]

Even if Plaintiff specifically identified a few complaints, incidents, or grievances which he had personal knowledge of, which he clearly has not, isolated incidents are generally insufficient to establish a supervisor's liability; indeed, the deprivations must be " 'obvious, flagrant, rampant and of continued duration ....' " Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1308 (11th Cir.2006) (quoting Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir.1999)). Knowledge imputed to the supervisor "must be so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights." Tittle v. Jefferson County Com'n, 10 F.3d 1535, 1542 (11th Cir.1994). The failure to act or implement policy must be in the face of repeated violations or other indicators signifying a strong likelihood that the situation will recur. See Harris v. City of Marion, 79 F.3d 56, 58-59 (7th Cir.1996). Furthermore, filing a grievance with a supervisory person does not alone make the supervisor liable for the allegedly violative conduct brought to light by the grievance, even if the grievance is denied. Wayne, 197 F.3d at 1106; Weaver v. Toombs, 756 F.Supp. 335, 337

---

inmates are restrained, or how often they are supervised. [Defendant's Exhibit G, pgs. 68:9-70:15.]

(W.D.Mich.1989), *aff'd,* 915 F.2d 1574 (6th Cir.1990); see also Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir.1984).

A review of the disciplinary reports issued for altercations occurring in the day-room of O-Dormitory at Union Correctional Institution for the years 2009, 2010, and 2011, and the grievances which resulted, supports the finding that there was no substantial risk to the safety of inmates.   [Defendants' Exhibit Q; Section A. i., supra.] These figures contradict Plaintiff's unsubstantiated assertion that "many inmates have been assaulted and stabb (sic) because of lack of supervision and less restraints." [Doc. 1, pg. 9] The documentation outlined above demonstrates that violent inmate-on-inmate incidents in the O-Dormitory day-room were extremely infrequent. [Defendants' Exhibit Q.] This is especially true when you consider how many times inmates had the opportunity to attend day-room over the time period reviewed. Generally, CMII status can attend day-room twice weekly. [Defendant's Exhibits E, and F; G, pgs. 23:20-24:16; J at 11(c)3.] Therefore, a CMII inmate would have the opportunity to attend day-room approximately 104 times per year. A CMII inmate can attend day-room 312 times over three years (the interval of review for disciplinary reports). Four incidents, occurring over three years, when inmates can attend day-room over one hundred times per year, is not evidence of a flagrant or rampant problem. Even if Swain and Reddish personally reviewed each one of the documents outlined above, the number of incidents and subsequent grievances does not demonstrate an obvious problem or that violent inmate-on-inmate incidents in the day-room were rampant which would support a finding that either Defendant had knowledge that the day-room under the current policies constituted a substantial risk to the inmates attending. As stated previously, isolated incidents will not suffice to impute knowledge on a supervisor. See Gray, supra; see also Tittle, and Harris, supra. Additionally, because no previous disciplinary report

stemming from an altercation in the O-Dormitory day-room was grieved by either party prior to the incident involving Ohlin and Oliver, Reddish and Swain would also have no idea whether the privacy screen, the manner of restraint, and method of supervision were possibly to blame if a problem had in fact existed. Therefore, there was nothing for either Defendant to react to.

Because Plaintiff has failed to sufficiently demonstrate that Defendants Swain and Reddish knew that allowing CMII inmates to attend day-room handcuffed behind their back, with a privacy screen in front of the door, and officers routinely checking on the room, constituted a substantial risk to inmate safety, Plaintiff has failed to prove the requisite causal connection between the incident and Defendants Swain and Reddish, and the claims pending against these Defendants must be dismissed.

**B. Defendants responded in an objectively reasonable manner.**

Plaintiff cannot demonstrate that Defendants failed to respond to the incident in an objectively reasonable manner. It has been held that an official may be held liable for failing or refusing to intervene in an assault when they have a reasonable opportunity to do so. Ensley v. Sopper, 142 F.3d. 1402, 1407-1408 (11th Cir. 1998); Terry v. Bailey, 376 F.App'x. 894, 896 (11th Cir. 2010). Plaintiff's deposition testimony reflects that no one saw inmate Ohlin attacking him. [Defendants' Exhibit G, pg. 54-55:25.] When asked where the Defendants were during the incident, Plaintiff replied that Defendants Woods, Harden, and McLemore were escorting inmates back to their cells from the day-room and Defendants Swain, and Reddish were not even at the prison. [Defendants' Exhibit G, pg. 45:12-19; pgs. 64:2-68:8.] Plaintiff also indicated that he did not cry out for help or bang on the door of the day-room in an attempt to summon help once the incident began. [Defendants' Exhibit G, pg. 55:9-16.] Plaintiff stated that the officers entered the day-room after the incident had ended, just as inmate Ohlin was attempting to help

Plaintiff to his feet.  [Defendants' Exhibit G, pg. 57:21-25.]  At that point, Robert Ohlin was secured in his cell, Plaintiff was then restrained, and Defendants Wood and Harden escorted him to Medical. [Defendants' Exhibits E and F.]  Accordingly, there is no evidence in the record that any of the Defendants who were actually at the prison failed to respond to the incident in a reasonable manner, as they had no means of knowing the incident had even occurred until they returned to the day-room to escort Plaintiff and inmate Ohlin back to their respective cells. [Defendants' Exhibits D; E; F; G, pg. 55:2-25.] In fact, once Defendants returned to the day-room and saw inmate Ohlin with blood on him, objectively reasonable actions were taken in securing Ohlin in his cell, initiating disciplinary action against inmate Ohlin, and bringing Plaintiff to medical for treatment.  [Defendants' Exhibits E, F, M and P.] Further, as explained supra., Defendants Swain and Reddish did not have any reason to believe that the O-dormitory day-room presented a substantial risk, therefore, their inaction was reasonable. Accordingly, Plaintiff's deliberate indifference claim against any Defendant necessarily fails.

**IV.  Defendants are Entitled to Qualified Immunity.**

Qualified immunity addresses the problem that the threat of being sued may stymie an officer's ability to perform his duties effectively. Garcynski v. Bradshaw, 573 F.3d. 1158, 1165-66 (11th Cir. 2009). Qualified immunity offers "complete protection for government officials sued in their individual capacities as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)) (additional quotations omitted).  Qualified immunity allows government officials to carry out discretionary duties without the fear of personal liability or harassing litigation. Anderson v. Creighton, 483 U.S. 635, 638 (1987).

For qualified immunity to apply, the official must prove that the act was within the scope of his/her discretionary authority when the allegedly wrongful act occurred, Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991).  The burden then shifts to the plaintiff to show that qualified immunity is not appropriate.  See Courson, 939 F.2d at 1487.  The court must conduct a two prong test to determine (1) whether "the facts alleged show the officer's conduct violated a constitutional right," and (2) "whether the right was clearly established."  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001).  The second prong is "undertaken in light of the specific context of the case, not as a broad general proposition."  Id.  Discretion is left to the court to determine which of the two prongs to address first.  See McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009) (citations omitted).  Defendants submit that there is no question that they was acting within their discretionary authority as to the incident alleged in this case.

Here, Plaintiff fails to meet either prong of the qualified immunity analysis.  Whether a defendant has violated a constitutional right at all is a necessary concomitant to the question of qualified immunity—if a defendant has not violated a law at all, he certainly has not violated clearly established law.  GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1366-67 (11th Cir. 1998).  Defendants are entitled to qualified immunity.

## V. Plaintiff cannot recover damages in the absence of a physical injury

"No federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  The Eleventh Circuit is in accord that, under 42 U.S.C. § 1997e(e), compensatory and punitive damages are unavailable, absent physical injury.  See Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007); Slicker v. Jackson, 215 F.3d 1225, 1229 (11th Cir. 2000)("compensatory damages under § 1983 may be awarded only based

on *actual injuries* caused by the defendant and cannot be presumed or based on the abstract value of the constitutional rights that the defendant violated"). The physical injury requirement applies to all federal claims, including constitutional claims. Harris v. Garner, 216 F.3d 970, 984-85 (11th Cir. 2000).

While 42 U.S.C. § 1997e(e) does not define "physical injury," the Eleventh Circuit has held that "in order to satisfy the statute, 'the physical injury must be more than de minimis, but need not be significant.'" Daughtry v. Moore, Slip Copy, 2009 WL 1151858, *5 (S.D.Ala. 2009), citing Dixon v. Toole, 225 F.App'x 797, 799 (11th Cir. 2007); see also Harris v. Garner, 190 F.3d 1279, 1286 (11th Cir. 1999), vacated, 197 F.3d 1059, reinstated in relevant part, 216 F.3d 970, 972 (11th Cir.2000)(en banc); Mitchell v. Horn, 318 F.3d 523, 536 (3rd Cir. 2003); Oliver v. Keller, 289 F.3d 623, 626-628 (9th Cir. 2002); Siglar v. Hightower, 112 F.3d 191, 193-94 (5th Cir. 1997), abrogated on other grounds by Wilkins v. Gaddy, 130 S.Ct. 1175 (2010).[7] This requirement supports the goal of the PLRA, which is "to reduce the number of frivolous cases filed by imprisoned plaintiffs, who have little to lose and excessive amounts of free time with which to pursue their complaints." Napier v. Preslicka, 314 F.3d 528, 531 (11th Cir. 2002).

In Luong v. Hatt, 979 F.Supp. 481 (N.D.Texas 1997), the District Court offered the following definition of a "physical injury" for the purposes of 42 U.S.C. § 1997e(e):

A physical injury is an observable or diagnosable medical condition

---

[7] The Supreme Court held in Wilkins that it is error to dismiss an Eighth Amendment excessive force claim because the plaintiff suffered only a *de minimis* physical injury. The Court grounded this conclusion on the principle that "'the core judicial inquiry' [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. at 1178. However, the Court's analysis in that regard is inapplicable to the analysis of the physical injury requirement of 42 U.S.C. § 1997e(e), which is not limited to Eighth Amendment claims, but applies to all federal civil actions. This is supported by the Third Circuit's analysis of the "more than *de minimis*" physical injury requirement in Mitchell, where the Third Circuit explicitly stated that its requirement was not based upon analogy to Eighth Amendment jurisprudence. See Mitchell, 318 F.3d at 536 n. 13.

> requiring treatment by a medical care professional. It is not a sore muscle, an aching back, a scratch, an abrasion, a bruise, etc., which last even up to two or three weeks. People in regular and ordinary events and activities in their daily lives do not seek medical care for the injuries they receive unless it obviously appears to be of a serious nature, or persists after home remedy care. Thus, the seriousness of the injury needed to rise above *de minimis*, would under Sigler v. Hightower, supra, require more than the types and kinds of bruises and abrasions about which the Plaintiff complains.  Injuries treatable at home and with over-the-counter drugs, heating pads, rest, etc., do not fall within the parameters of 1997e(e).

Luong, 979 F.Supp. at 486 (N.D.Texas 1997).  While the Eleventh Circuit has not adopted this precise definition of a "more than *de minimis*" injury, it has been applied by United States District Courts in every state in the Eleventh Circuit.  See Watkins v. Trinity Service Group, 2006 WL 3408176, at *4 (M.D.Fla. 2006); Green v. Grace, 2010 WL 63078, at *3-4 (N.D.Fla. 2010); Harvey v. Teal, 2010 WL 427435, at *5 (N.D.Fla. 2010); Daughtry v. Moore, 2009 WL 1151858, *5 (S.D.Ala. 2009); Johnson v. Moody, 2006 WL 898135, at *7 (S.D.Ala. 2006); Anderson v. Jones, 1999 WL 1565203, at *6 (S.D.Ala. 1999), aff'd without opinion, 245 F.3d 795 (11th Cir.2000); Moore v. Washington, 2010 WL 3937320, at *3 (M.D.Ga. 2010); Talley v. Johnson, 2008 WL 2223259, at *3 (M.D.Ga. 2008); Johnson v. Muscogee County Jail, 2008 WL 597792, at *2 (M.D.Ga. 2008); Johnson v. Bainbridge Public Safety, 2007 WL 2593969, at *5 (M.D.Ga. 2007); Radford v. Johnson, 2006 WL 2927578, at *6 (M.D.Ga. 2006).  This definition has also been cited positively by both the Third and Sixth Circuits as well.  See Perez v. United States, 330 F.App'x 388, 389 (3rd Cir. 2009); Jarriett v. Wilson, 162 F.App'x. 394, 401 (6th Cir. 2005).

In this case, Defendants have provided medical records indicating that Plaintiff had only cuts, scratches, and other minor injuries to his head.  [Defendants' Exhibit P at 4; Defendants' Exhibit S at 4-5] Plaintiff complained of pain to his left ankle, but the nurse conducting the

examination noted that there was no swelling or signs of dislocation.[8] [Id.] Plaintiff did not see medical again regarding any physical conditions until June 1, 2011, when he sought treatment for pain in his eye, ear, and ankle, which are injuries unrelated to that incident. [Defendants' Exhibit S at 2.] During that consultation, Plaintiff denied any recent trauma. [Defendants' Exhibit S at 2.] The nurse noted that Plaintiff was walking around his cell without difficulty. [Id.]  The nurse also noted no discoloration or drainage from Plaintiff's eyes or ears [Id.].  On June 3, 2011, Plaintiff again sought medical attention for his eye, ear, and ankle. [Defendants' Exhibit S at 1.] Plaintiff only sought medical for the injuries resulting from the incident in question immediately after the incident took place. At his deposition, Plaintiff alleged that he has a facial deformity, but there is no evidence supporting that claim. [Defendants' Exhibit G, pg. 50:4-17.][9]

Because Plaintiff's minor scratches and lacerations are *de minimis* injuries, Plaintiff may not recover compensatory or punitive damages under 42 U.S.C. § 1997e(e) and his claims for compensatory and punitive damages must be dismissed.  See Tate v. Rockford, Slip Copy, 2012 WL 5846290, at *4 (11th Cir. 2012)(holding that "a laceration on [an inmate's] forehead, several small abrasions and cuts, and a swollen right eye" are "*de minimis*" injuries); Harris, 190 F.3d at 1286 (11th Cir. 1999)(dry shave resulting in bleeding, inflammation, irritation, ingrown hairs, purulence and pain was a *de minimis* injury for the purposes of 42 U.S.C. § 1997e(e)); Mann v. McNeil, 360 F.App'x. 31, 32 (11th Cir. 2010)(injuries including scrapes and marks on knees and legs were *de minimis* and insufficient to satisfy the physical injury requirement of 42 U.S.C. §

---

[8] Further, there is no indication that Plaintiff's complaints regarding his ankle are related to the incident which occurred on May 7, 2011.

[9] "Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records." Whitehead v. Burnside, 403 F.App'x 401, 403 (11th Cir. 2010), *citing* Bennett v. Parker, 898 F.2d 1530 (11th Cir.1990)(discounting inmate's claim as a conclusory allegation of serious injury that was unsupported by any physical evidence, medical records, or the corroborating testimony of witnesses). See also Brown v. Smith, 813 F. 2d 1187, 1189 (11th Cir. 1987).

1997e(e)); <u>Dixon</u>, 225 Fed. App'x at 799 (11th Cir. 2007)(bruising is only a *de minimis* injury, insufficient to satisfy the physical injury requirement of 42 U.S.C. § 1997e(e)); <u>Sigler</u>, 112 F.3d at 193-194 (5th Cir. 1997)(sore bruised ear is a *de minimis* injury insufficient to support a claim for emotional or mental suffering); <u>Daughtry</u>, 2009 WL 1151858, *5 (S.D.Ala. 2009)(bumps on neck and shoulders insufficient to satisfy the physical injury requirement of 42 U.S.C. § 1997e(e)); <u>Luong</u>, 979 F.Supp. at 486 (N.D.Texas 1997)(bruises and abrasions insufficient to satisfy the physical injury requirement of 42 U.S.C. § 1997e(e)).

Under 42 U.S.C. § 1997e(e), the primary inquiry is to the extent of the injury.  In this case, the medical records submitted by Defendants demonstrate that, at best, Plaintiff sustained only *de minimis* injuries. Therefore, under the Prison Litigation Reform Act and Eleventh Circuit precedent, Defendants are entitled to summary judgment on this issue and Plaintiff may not recover compensatory or punitive damages in this case.

Respectfully submitted,

**PAMELA JO BONDI**
ATTORNEY GENERAL

/s/ Matthew F. Vitale
Matthew F. Vitale
Assistant Attorney General
Florida Bar No.: 0098163
Office of the Attorney General
The Capitol PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 488-4872
matthew.vitale@myfloridalegal.com

/s/ Cedell Ian Garland
Cedell Ian Garland
Assistant Attorney General
Florida Bar No.: 0058640
cedell.garland@myfloridalegal.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the foregoing has been furnished by U.S. Mail to WARREN OLIVER, DC# 781409, Florida State Prison, 7819 NW 228th Street, Raiford, Florida 32026 on this 26th day of March, 2013.

<u>/s/ Matthew F. Vitale</u>
Matthew F. Vitale
Attorney-Assistant Attorney General
