UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WARREN OLIVER,

                Plaintiff,

v.                                 Case No. 3:11-cv-964-J-37MCR
OFFICER HARDEN, et al.,

                Defendant.

_____

**ORDER**

**I.  Status**

Plaintiff Warren Oliver, an inmate of the Florida penal system, is proceeding on a Complaint[1] (Complaint) (Doc. #1) filed on September 26, 2011.  On August 2, 2012, the Court dismissed Defendant James Davis from the action without prejudice.  Order (Doc. #49).  The Court granted Defendants' January 6, 2012, Motion to Dismiss (Doc. #19) with respect to the following: (1) the claim that officers paid Robert Ohlin to assault Plaintiff, and (2) any claim against Defendant Brown.  Order (Doc. #56).  In all other respects, the Court denied the Motion to Dismiss.  Id.  Finally, the Court dismissed Defendant Brown from the action.  Id.

_____

[1] When referring to the Complaint, the Court refers to the pagination assigned by the Electronic Filing System.

The Defendants are Matthew Harden; Barry Reddish; Christopher Wood; Shawn Swain; and Eugene McLemore.[2]  Defendants' March 26, 2013, Motion for Summary Judgment (Doc. #108) (Motion for Summary Judgment) is pending before the Court.  Defendants filed Exhibits (Doc. #108), Defendants' Notice of Filing Exhibits Cited in Defendants' Motion for Summary Judgment (Doc. #109), a Notice of Filing Supplement to Summary Judgment Exhibit Q (Doc. #111), Defendants' Notice of Filing Executed Exhibit "C" to Their Motion for Summary Judgment (Doc. #113), Notice of Supplemental Authority (Doc. #127), and Notice of Filing Redacted Exhibit A (Doc. #129).  Plaintiff, on May 13, 2013, filed a Response to Defendants' Motion for Summary Judgment (Doc. #121) (Response) and Exhibits (Doc. #122).  See Orders (Docs. #6 & #117).

In the Complaint, the sole claim against the Defendants is as follows:

> Eighth Amendment prohibits cruel and unusual punishment.  The Supreme Court says that prison officials will be liable for violating the Eighth Amendment when they are deliberately indifferent to the substantial risk of serious harm to inmates.  The officers and Warden were deliberately indifferent for not monitoring us when we were in the day room, and not having the proper restraints on.

Complaint at 8.  Defendants are named in their individual capacities.  Id. at 1, 12.  As relief, Plaintiff seeks an award of

---

[2] In the Complaint, Plaintiff refers to Officer Woody and Sgt. McCal.  The officers in question are identified as Officer Christopher Wood and Sgt. Eugene McLemore.

compensatory and punitive damages.  Id. at 12.  He also seeks unspecified injunctive relief.  Id.

## II.  Standard of Review

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Crawford v. Carroll, 529 F.3d 961, 964 (11th Cir. 2008) (citations omitted). "The burden of demonstrating the satisfaction of this standard lies with the movant," Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003), cert. denied, 540 U.S. 1182 (2004), who must present "depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" to show that the facts cannot be genuinely disputed, Fed. R. Civ. P. 56(c)(1)(A).  An issue is genuine when a reasonable jury could return a verdict for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  In addition, judgment should enter "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-23.

"'When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" Allen v. Bd. of Pub. Educ. for Bibb Cnty., 495 F.3d 1306, 1314 (11th Cir. 2007) (quoting Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)). In ruling on a motion for summary judgment, a court must "constru[e] the facts and draw[] all reasonable inferences therefrom in the light most favorable to the non-moving party." Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005) (citing Cuesta v. Sch. Bd. of Miami-Dade Cnty., 285 F.3d 962, 966 (11th Cir. 2002)).

### III.  Summary of Arguments

In the Motion for Summary Judgment, Defendants address the following issues: injunctive relief; failure to protect; qualified immunity; and physical injury. Motion for Summary Judgment at 6-23. After first reviewing the allegations of the Complaint, the Court thereafter addresses these matters.

### IV.  The Complaint

The following factual allegations in the Complaint are relevant to the claims against the remaining Defendants. On May 7, 2011, while confined in the day room at Union Correctional Institution

- 4 -

(UCI) (an institution within the Florida Department of Corrections (FDOC)), Plaintiff was assaulted by inmate Robert Ohlin. Complaint at 8-9. On that date, Officers Wood, Harden, McLemore, and an unnamed officer escorted Plaintiff and other inmates to the day room in handcuffs, not full restraints. Id. at 8. In the day room, Ohlin slipped out of his handcuffs and assaulted Plaintiff with the handcuffs. Id. When Plaintiff exited the day room, he was covered in blood, having sustained cuts and bruises to his face. Id. at 9.

Correctional officers placed a white screen in front of the day room, blocking the officers' view from the Officer's Station towards the day room. Id. at 8. Inmates were not otherwise monitored in the day room. Id. Previously, Ohlin assaulted inmates constrained in handcuffs and shackles. Id. at 9. Many inmates were assaulted and stabbed due to lack of supervision and minimal restraints, even though inmates are supposed to be monitored at all times. Id.

Thereafter, Ohlin, on May 8, 2011 and May 9, 2011, made telephone calls in which he told his family he assaulted Plaintiff. Id. Unnamed individuals would not let Plaintiff press charges. Id. Defendant Swain, the shift supervisor, and Defendant Reddish, the Warden, knew about the risk to Plaintiff's health and safety because they are supervisors. Id. at 9-10. Defendant Reddish received many complaints. Id. at 10. Many inmates complained about the lack of supervision and poor restraints. Id. Officers cannot see into the day room from the Officer's Station. Id. An officer has to stand

- 5 -

on the outside of the day room to monitor the inmates inside of the day room.  Id.  In response to the complaints, Defendant Reddish should have directed the removal of the white screen from in front of the Officer's Station and day room, and he should have directed the officers to monitor the inmates.  Id.

On May 10, 2011, Plaintiff filed an emergency administrative grievance with the Assistant Warden. (Doc. #1-1 at 1).  Assistant Warden Johnson and Warden Reddish referred the matter to the Office of the Inspector General.  Id. at 4.  Plaintiff appealed to the Secretary of the FDOC.  Id. at 7.  The appeal was returned without action, stating the grievance process is not a means to seek information, guidance, or monetary compensation.  Id. at 10.  Also, the response informed Plaintiff that he had not contacted the appropriate office to seek to press charges against Ohlin.  Id.

## V.   FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PLAINTIFF'S ALLEGATIONS

### FAILURE TO PROTECT/PHYSICAL INJURY

The Court construes Plaintiff's Complaint to be an action under 42 U.S.C. § 1983.  In order to prevail in section 1983 action, Plaintiff must demonstrate: "(1) that the defendant deprived [him] of a right secured under the Constitution or federal law and (2) that such a deprivation occurred under color of state law."  Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (citing Arrington v. Cobb Cnty., 139 F.3d 865, 872 (11th Cir. 1998)).  Here, Plaintiff claims he was subjected to an assault by another inmate

- 6 -

due to the Defendants failure to monitor inmates and place them in proper restraints.  Plaintiff claims this alleged failure to ensure a safe environment subjected him to cruel and unusual punishment in violation of the Eighth Amendment.  Complaint at 8.  "The Eighth Amendment of the United States Constitution forbids 'cruel and unusual punishments.' U.S. Const. amend. VIII.  The Eighth Amendment is applicable to the states through the Fourteenth Amendment." Bingham, 654 F.3d at 1175 (citation omitted).

Plaintiff claims Defendants were deliberately indifferent for failing to monitor and properly restrain inmates in the day room. Plaintiff alleges Defendant Reddish failed to ensure a safe environment, free from victimization, for prisoners.  Plaintiff states Defendant Reddish's failure to ensure a safe environment and to adequately respond to security complaints were evidenced by Ohlin slipping out of his handcuffs and assaulting Plaintiff in the day room, taking advantage of the lack of supervision in the day room.

In response to Defendants' Motion for Summary Judgment, Plaintiff contends he has raised a valid failure to protect claim against Defendants pursuant to the Eighth Amendment.  Response at 1-9.  Specifically, Plaintiff asserts that he was subjected to an assault by Ohlin, and Defendants were responsible for failing to ensure a safe prison environment "by allowing a white screen in front of the officer['s] station and day room and not [providing] the proper supervision when assaults and fights occurred in the day

room." Id. at 3.  Plaintiff elaborates: "that the Eighth Amendment prohibited defendants from subjecting the plaintiff to the inhumane conditions of confinement[.]"  Id. at 2.

Prison officials have a duty to protect inmates from violence, including assault from inmates.  To prove a prison official violated the Cruel and Unusual Punishments Clause, there has to be a showing that the prison official had a "sufficiently culpable state of mind."  Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citation omitted).  In prison condition cases, the culpable state of mind is "deliberate indifference" to the health or safety of the inmate. Id. (citations omitted).  The seminal Supreme Court case on deliberate indifference to a prisoner's safety is Farmer.  In Farmer, the Supreme Court recognized that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  Id. at 828-29 (citing Helling v. McKinney, 509 U.S. 25 (1993); Wilson v. Seiter, 501 U.S. 294 (1991); Estelle v. Gamble, 429 U.S. 97 (1976)).  Suits against prison officials for failure to protect must satisfy a subjective requirement.  Id. at 837-38.  Specifically, the Court held:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . .  The Eighth Amendment does not outlaw cruel and unusual

> "conditions"; it outlaws cruel and unusual
> "punishments.". . . But an official's failure
> to alleviate a significant risk that he should
> have perceived but did not, while no cause for
> commendation, cannot under our cases be
> condemned as the infliction of punishment.

Id.

"Even when an officer is not a participant in the excessive force, he can still be liable if he fails to take reasonable steps to protect the victim." Ledlow v. Givens, No. 12-12296, 2012 WL 6176471, at *4 (11th Cir. Dec. 12, 2012) (per curiam) (not selected for publication in the Federal Reporter) (citation omitted), cert. denied, 133 S.Ct. 2802 (2013); see Keating v. City of Miami, 598 F.3d 753, 765 (11th Cir. 2010), cert. dismissed, Timoney v. Keating, 131 S. Ct. 501 (2010) (finding a supervisor may be liable under a theory of supervisory liability if he has the ability to prevent or discontinue a known constitutional violation and then fails to exercise his authority to stop the constitutional violation).

Defendants Swain and Reddish may not, however, be held liable under a theory of respondeat superior.

> "Supervisory officials are not liable
> under section 1983 on the basis of respondeat
> superior or vicarious liability." Belcher v.
> City of Foley, Ala., 30 F.3d 1390, 1396
> (11th Cir. 1994) (internal quotation marks
> and citation omitted). "The standard by which
> a supervisor is held liable in her individual
> capacity for the actions of a subordinate is
> extremely rigorous." Gonzalez,[3] 325 F.3d at
> 1234 (internal quotation marks and citation

---

[3] Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003).

- 9 -

> omitted). "Supervisory liability occurs either
> when the supervisor personally participates in
> the alleged constitutional violation or when
> there is a causal connection between actions of
> the supervising official and the alleged
> constitutional deprivation." Brown v. Crawford,
> 906 F.2d 667, 671 (11th Cir. 1990).

Danley v. Allen, 540 F.3d 1298, 1314 (11th Cir. 2008); see Braddy v. Fla. Dep't of Labor & Emp't Sec., 133 F.3d 797, 801 (11th Cir. 1998) (finding supervisory liability requires something more than stating a claim of liability under a theory of respondeat superior).

Plaintiff is required to show a causal connection between the actions of Defendants Swain and Reddish and the alleged constitutional deprivation. Indeed, necessary causal connection can be established if: (1) the supervisor knew about and failed to correct a widespread history of abuse; or (2) the supervisor's custom or policy resulted in a constitutional violation; or (3a) the supervisor directed the subordinate to act unlawfully; or (3b) the supervisor knew that the subordinate would act unlawfully and failed to stop him from acting unlawfully. Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003). But, "[t]he standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." Id. at 1360-61 (internal quotation marks omitted and citation omitted).

Plaintiff does not allege Defendants Swain and Reddish personally participated in the alleged failure to protect; however, in an attempt to impose liability upon Defendants Swain and Reddish,

Plaintiff contends there is a widespread custom of failing to protect inmates at UCI. Response at 5-6. Additionally, Plaintiff claims Defendants Swain and Reddish "failed to ensure that their direct subordinates follow the policies that was [sic] established [in] Ch. 33-602.220(d) unobstructed observation by staff in confinement and (2) of specific, low-cost actions that Warden Reddish could have taken and that his successors successfully undertook." Id. at 2. Additionally, Plaintiff argues there was failure to adequately supervise correctional officers, "resulting in corruption and incompetence among the officers and lack of reasonable protection of inmates[.] Id. at 2-3 (citation omitted).

The Florida Administrative Code (Code), § 33.602.220 Administrative Confinement states, in pertinent part:

> (4) Administrative Confinement Facilities.
>
> . . . .
>
> (d) The administrative confinement cells shall be physically separate from other confinement cells and the cell doors will feature remotely controlled locking devices, whenever possible given the physical design of the facility, and the number of inmates housed in administrative confinement shall not exceed the number of bunks in the cell. Whenever such location is not possible, physical barriers shall preclude the cross association of those in administrative confinement with those in other status confinement. **Administrative confinement cells shall be built to permit verbal communication and**

> > **unobstructed   observation   by   the
> > staff.**

<u>Id</u>. (emphasis added).

This section of the Code also provides:

> (6) Restrain and Escort Requirements.

> > (a) Prior to opening any cell for any
> > purpose, including exercise, medical
> > or disciplinary call-outs, telephone
> > calls, recreation, and visits, all
> > inmates   in   the   cell   **shall   be
> > handcuffed behind their backs,** unless
> > documented medical conditions require
> > that   an   inmate   be   handcuffed   in
> > front.   In such cases, waist chains
> > will   be   used   in   addition   to   the
> > handcuffs.

> > . . . .

> > (c) Prior to escorting an inmate from
> > a   cell,   the   inmate   shall   be
> > thoroughly searched.   If the inmate
> > is being taken outside the immediate
> > housing   unit,   leg   irons   and   other
> > appropriate restraint devices shall
> > be applied.

<u>Id</u>. (emphasis added).   Additionally, the Code provides that an
inspection and tour of the administrative confinement unit be
conducted "[a]t least every 30 minutes by a correctional officer,
but on an irregular schedule."   <u>Id</u>. at (7)(a).

There is a shield policy in effect in the Special Housing Units
of UCI.   Policy 1-6 Shields, dated April 3, 2009, provides:

> 1. Face sheets of inmates who have, through
> proper steps, been placed onto the 1-6 List by
> the committee will be printed on bright fuscia
> colored paper.   This will enable assigned staff

> to more easily recognize the inmates as they
> enter the wing.
>
> 2. Prior to escorting medical, psychological or
> classification staff onto the wing the
> Correctional Staff will look onto wing for
> inmates assigned to the 1-6 list and shield
> only those cells.
>
> 3. After the escort is complete and the
> effected staff member departs from the wing,
> the Correctional Staff will immediately
> retrieve the shields.
>
> **NOTE: ONLY INMATES WHO APPEAR ON THE 1-6 LIST WILL BE
> AFFECTED.  NO OTHER INMATES WILL HAVE THE FUSCIA FACE
> SHEETS NOR BE SHIELDED.**
>
> IT WILL BE THE RESPONSIBILITY OF THE Unit Supervisor to
> review the list daily for any additions or deletions to
> the list.  This is an outstanding tool to assist in
> prevention of subjecting Non-Security Staff to the lewd
> behavior routinely displayed by these inmates; any abuse
> of the above steps will not be tolerated.

Ex. I (emphasis in original).[4]

The Code, § 33.601.800 Close Management states, in pertinent part, that close management is "the confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privilege of others."  Ex. J at 1.  There are three close management levels: CMI, CMII, and CMIII, with CMI being the most restrictive single cell housing level, and CMIII being the least restrictive housing

---

[4] The Court hereinafter refers to the Exhibits (Doc. #108) to Defendants' Motion for Summary Judgment as "Ex."

level. Id. This part of the Code defines Lewd or Lascivious Exhibition as being when an inmate intentionally masturbates, exposes genitals without authorization, or commits any other sexual act not involving contact with a victim. Id. at 2. This definition includes "the simulation of any act involving sexual activity in the presence of a staff member or volunteer." Id.

The Code provides CMII inmates with access to the day room, id. at 9; however, "CMII inmates will be restrained during . . . dayroom access unless determined by the senior correctional officer that the inmate can safely participate without restraints." Id. The Code also provides that CMII inmates be handcuffed behind their backs prior to the opening of the doors to their cells. Id. at 10. The senior correctional officer, however, may authorize unrestrained participation in day room activities. Id. The Code also provides that at least every thirty minutes, on an irregular schedule, correctional officers inspect and tour the close management unit. Id. at 11.

In this instance, Officer Justin Altstatt completed an Incident Report on May 7, 2011. Ex. P at 1. Under the Details of Incident, Officer Altstatt stated, in part:

> At approximately 2300 hours on May 7, 2011, while assigned as O Dorm Security Officer, I was in the process of removing inmates from the group room. Only two inmates remained in the group room at that time, Inmate OHLIN, Robert #16092, housed in O3-207S, and Inmate OLIVER, Warren #781409, housed in O3-208S. As I was returning from an escort, I heard yelling

coming from the group room and, when I arrived at the cell front, I opened the door and Inmate OHLIN exited the room with blood on his hands and shirt.  He stated that the blood was not his.  I observed Inmate OLIVER sitting in the left-hand corner of the room, bleeding from wounds to his head.  Inmate OLIVER stated that he had been "jumped on."  Inmate OHLIN stated that he was not involved in anything.  Inmate OLIVER was escorted to the Urgent Care Area for medical treatment and Inmate OHLIN was returned to his assigned cell.  The incident is referred to the shift supervisor for further disposition.

Id.

Under the Shift Supervisor Comment section of the Incident Report, Lieutenant Jon Jenkins, the Shift Supervisor, stated that although Officer Altstatt did not witness the incident, it was apparent that Ohlin battered Plaintiff.  Id.  It is noted in the Comment that Jenkins instructed Altstatt to write Ohlin a disciplinary report.  Id.  According to the Comment, C. Green, RN, evaluated Plaintiff at urgent care, and she noted "several lacerations and scratches to his head and neck area."  Id.  She also noted "a welted area and redness to the left side of [Plaintiff's] head."  Id.  Finally, the Comment stated that although Plaintiff complained of pain in his left ankle, the Nurse noted no swelling or discoloration.  Id.  Nurse Green treated Plaintiff and released him to his housing unit, but Nurse Green added him to the sick call list for a medical follow-up.  Id.

Under Review dated May 10, 2011, Correctional Officer Chief Jefferson stated: "review this incident to ensure that proper

- 15 -

monitoring is being conducted during group[.]" Id. Assistant Warden

Jeffcoat, under Review dated May 10, 2011, remarked "noted."  Id.

Officer Altstatt, on May 7, 2011, wrote a Disciplinary Report

against Ohlin for battery or attempted battery. Ex. M.  In the

Statement of Facts, he said:

> At approximately 2300 hours on May 7, 2011,
> while assigned as O Dorm Security Officer, I
> was in the process of removing inmates from the
> group room.  Only two inmates remained in the
> group room at that time, Inmate Ohlin, Robert
> #168092, housed in 03-2075, and inmate Oliver,
> Warren #781409, housed in 03-208S.  As I was
> returning from an escort, I heard yelling
> coming from the group room and, when I arrived
> at the cell front, I opened the door and inmate
> Ohlin exited the room with blood on his hands
> and shirt.  He stated that the blood was not
> his.  I observed inmate Oliver sitting in the
> left-hand corner of the room, bleeding from
> wounds to his head.  Inmate Oliver stated that
> he had been "jumped on." Inmate Ohlin stated
> that he was not involved in anything.  Inmate
> Ohlin is being charged with 1-18, battery or
> attempted battery on an inmate.  This incident
> is referred to the shift supervisor for further
> disposition.

Id. at 1.  The disciplinary team found Ohlin guilty of the

disciplinary infraction, and he received sixty days in disciplinary

confinement.  Id. at 1-2.

Defendant Reddish, in his declaration (titled "Declaration of

Warden Barry Reddish"), confirms that officers "conduct routine

security checks on the day-room in fluctuating intervals, not

exceeding 30 minutes." Ex. B at 1.  He describes additional

monitoring of the day room by the officer stationed on the O-

Dormitory quarterdeck.  Id. at 1-2.  He states that prior to the

- 16 -

incident, "I do not recall seeing any documentation that alerted me to any issues involving the O-Dormitory day-room, the use of screens, the method of supervision employed, or the manner of restraint utilized." Id. at 1.  In reference to the screen policy, he explains that it was implemented after current and former female FDOC staff members prevailed in lawsuits concerning sexual misconduct by inmates.  Id.  The screen is placed to ensure that "inmates cannot view the female officer on the wing, or in this case, the control room."  Id.  Finally, he mentions that CMII inmates are required to be restrained behind their backs with handcuffs while being escorted to and from the day room and while in the day room, but a Senior Officer may authorize unrestrained day room time.  Id. at 2.

Defendant Swain, in his declaration (titled "Declaration of Captain Shawn Swain"), states that he was off-duty on May 7, 2011. Ex. C (Doc. #113-1) at 1.  He explains that prior to the altercation on May 7, 2011, he "had no indication that the screen outside the door of the day-room which protects female employees from lewd and lascivious exhibitions, the routine security checks, or the manner in which Close Management II (CMII) inmates were restrained was causing or would cause a safety issue within the day room."  Id. Additionally, he states that he was never informed verbally or in writing of any problems related to privacy screens, security checks on the day room, or the manner in which CMII inmates are restrained within the day room.  Id.  He confirms that the privacy screens are

positioned so that inmates cannot observe female officers in the control room. Id. He attests that "[t]he screen is angled so that the officer stationed on the quarterdeck has a clear view inside the door." Id. at 2.  In particular, Defendant Swain attests that "officers conducting routine security checks can see inside the window without moving the screen." Id.  Finally, he explains that it only takes between thirty seconds to three minutes to escort an inmate from the day room to a cell and to secure the inmate in the cell. Id.

Defendant McLemore, in his declaration (titled "Declaration of Sergeant Eugene McLemore"), attests that it was his responsibility to transport inmates to and from the O-dormitory day room on May 7, 2011. Ex. D at 1.  He explains that generally inmates are transported with their hands cuffed behind their back. Id.  He states that inmates remain restrained in that fashion while in the day room unless a Senior Officer authorizes the inmates to be unrestrained. Id.  Additionally, he states that the day room is routinely checked by security personnel. Id.  Also, the officer stationed on the quarterdeck is responsible for monitoring the day room, except under exigent circumstances. Id.  With regard to the white screen, he states that it is placed a few feet in front of the day room door "to prevent inmates from masturbating while staring at female staff members who are stationed in the control room." Id. More specifically, he confirms that the screen neither inhibits

routine security checks, nor does it prevent the quarterdeck officer from seeing inside of the day room.  Id.

In particular, Defendant McLemore attests that prior to the altercation, he had "no indication that there was any animosity or ill will" between inmate Ohlin and Plaintiff.  Id.  Of significance, Plaintiff did not state that he was in fear for his safety, that he wanted to return to his cell, or that Ohlin threatened him.  Id. McLemore states that Plaintiff and the other inmates did not express any safety concerns.  Id. at 1-2.  He explains that Ohlin and Oliver had been in the day room together on previous occasions without conflict.  Id. at 2.  Also, McLemore states he was not aware of Ohlin being "a particularly violent inmate."  Id.  He notes that this incident occurred while officers were escorting inmates from the day room to their cells, and an escort to a cell and securing an inmate takes "a maximum of 2-3 minutes."  Id.  With respect to post-assault medical care, McLemore attests that Plaintiff was secured and escorted to medical for treatment of his injuries, and escorting an inmate to medical from O-Dormitory takes approximately fifteen to thirty minutes, depending on circumstances within the institution.  Id.

McLemore describes the day room as a place where CMII inmates generally behave themselves because it is a valued privilege and they hope to transition to the less-restrictive CMIII status.  Id. Additionally, he notes that attendance is not mandatory, and any

inmate who fears for his safety may refuse to attend or ask to be returned to his cell.  Id.

Defendant Wood, in his declaration (titled "Declaration of Officer Christopher Wood"), also attests that he helped transport inmates to and from the day room on May 7, 2011. Ex. E at 1.  He states there were "no signs of resentment or bad feelings" between Plaintiff and Ohlin prior to their altercation, and they attended day room together in the past, without incident.  Id.  Wood states he had no reason to believe Ohlin to be a particularly violent inmate.  Id.  Wood explains that upon discovery of the incident, Officer Harden and he secured Ohlin in his cell, which took approximately one minute, and then the officers escorted Plaintiff to medical for treatment.  Id.

Wood further states that Plaintiff "never mentioned inmate Ohlin to me, let alone stated that he posed a risk to him."  Id. at 2.  Additionally, Wood attests that inmates had not expressed any safety concerns about the privacy screen, the lack of constant supervision, or the manner in which the inmates were restrained. Id.  He reiterates that there are routine (every thirty minutes) security checks of the day room, and the officer stationed on the quarterdeck also monitors the day room.  Id.  He explains:

> When a female staff member is stationed in the control room, a screen is placed in front of the day-room door when there is an inmate or inmates attending the day-room who have a history of masturbating while staring at female staff.  The screen is stationed so that inmates cannot tamper with or deface it.  The screen

> does not obstruct the view of either the officer on the quarterdeck, nor the officer or officers conducting security checks.

Id.

Defendant Harden, in his declaration (titled "Declaration of Officer Matthew Harden"), attests that he was transporting inmates to and from the day room on May 7, 2011. Ex. F at 1. He too notes that he observed no animosity between Plaintiff and Ohlin on that date, and that previously Plaintiff and Ohlin attended day room activities without incident. Id. Harden states: "[i]f I had knowledge of any animosity between Oliver and Ohlin, I would never have let them attend day-room together as I would be subjecting every inmate in the dayroom, myself, and my fellow officers to an unnecessary risk." Id.

Harden explains that after the incident, he along with Officer Wood secured Ohlin in his cell, taking approximately one-minute to perform this duty, and then returned to the day room to secure and escort Plaintiff to medical. Id. Harden states that he never thought of Ohlin as being a particularly violent inmate. Id. Harden also states that Plaintiff never expressed any fear for his safety or that Ohlin posed a risk to him. Id. at 2. In particular, Harden explains that a screen is placed outside the day room door "to prevent inmates from masturbating while staring at the female staff, which is also known as 'gunning.'" Id. He attests that the screen is placed so that inmates cannot tamper with or deface the screen, and it is angled so that it blocks the inmates' view of the

- 21 -

female officers in the control room.  Id.  He notes that the screen does not prevent the officers conducting security checks or the officer on the quarterdeck from monitoring inmates in the day room. Id.  Finally, he states that the incident took place while officers were escorting inmates back to their cells at the conclusion of the day room period, and transporting an inmate back to his cell and securing him takes, at most, a few minutes.  Id.

Plaintiff was deposed regarding the incident upon which his Complaint is based.  Ex. G, Excerpts of Plaintiff's Deposition taken November 9, 2012 (Deposition).[5]  Plaintiff confirmed that he did not know Ohlin prior to the May 7, 2011 incident.  Id. at 8.  Plaintiff admitted that he had been present in the day room with Ohlin prior to May 7, 2011, and there had never been a physical altercation between them.  Id.  He testified that some inmates have the skill to slip out of handcuffs.  Id. at 22.  Plaintiff explained that the attack by Ohlin was unexpected, as previous interactions with Ohlin had been "friendly."  Id. at 30.  Thus, Plaintiff did not warn escorting officers that Ohlin would attack him.  Id. at 30-31.

Of import, Plaintiff, in his Deposition, testified that prison administrators knew that the white screen in front of the O-Dormitory day room created a dangerous situation prior to May 7, 2011 because inmates complained about it and assaults happened in the day room.  Id. at 36.  When asked if he had any personal

---

[5] When referring to the Deposition, the Court refers to the pagination assigned by the Electronic Filing System.

knowledge of inmates complaining about the white screen in front of the day room, Plaintiff responded that "[s]ome inmates had complained, but I don't know their name[s]." Id. Plaintiff said that an unnamed white inmate told him that he was raped in the day room, but Plaintiff admitted that he did not know if the statement was true. Id. Plaintiff also testified that he heard about incidents of inmates getting stabbed and beaten inside the day room, but Plaintiff had never witnessed these type of events in the day room. Id. at 37. Plaintiff did not know dates or times of the incidents or the names of the inmates involved, but he was told "there was a lot of stabbing, a lot of rape was going on, a lot of fights, assaults was going on inside that dayroom." Id. at 38.

Plaintiff admitted that prior to May 7, 2011, he received disciplinary reports for lewd or lascivious exhibition or for obscene or profane act for masturbating while looking at a female employee. Id. at 39-40. Plaintiff further admitted that he was found guilty of the charged offenses. Id. at 40-44; see Ex. H, Disciplinary Reports Received by Plaintiff for Lewd or Lascivious Exhibition/Profane Acts.

Of note, Ohlin, on April 5, 2010, slipped his right handcuff, freed both of his wrists, and attempted to attack an inmate in N-Dormitory, but an officer was able to intervene and prevent the attack. Ex. N. Prior to May 7, 2011, Plaintiff received two disciplinary reports for fighting. Ex. O. For the period June 1, 2009 to May 7, 2011, there were three fighting/assault incidents,

- 23 -

other than the one between Plaintiff and Ohlin, which "arguably occurred" in the day room of UCI's O-Dormitory. Ex. Q at 2. The first incident occurred on March 28, 2011 (a fight on O-Dormitory), the second incident occurred on April 18, 2011 (an inmate slipping his handcuffs off during "psych group" and attacking another inmate), and the third incident occurred on May 4, 2011 (an inmate slipping his restraints and striking another inmate in the upstairs day room). Id. at 4-14.

Also presented to the Court as Exhibits are the lawsuits which resulted in the FDOC adopting the screen policy after the Department was held liable under Title VII "because it unreasonably failed to remedy the sexual harassment [of female employees] by its inmates." Ex. R, Title VII Lawsuits, at 5.[6] Additionally, an excerpt of Plaintiff's medical record shows that on May 7, 2011, medical staff examined Plaintiff at 2320 (11:20 p.m.), after a physical altercation at approximately 2300 (11:00 p.m.). Ex. S (Doc. #109-1) at 4. The nurse cleaned the wounds and applied medicine. Id. The nurse instructed Plaintiff to clean the wounds with soap and water and to report back to medical on May 9, 2011. Id. In a Diagram of Injury, the nurse recorded the following injuries to Plaintiff's head: an over two-inch laceration to the right forehead; three one-inch lacerations under the right eye; two wounds less than a quarter inch in length; a welted area mildly raised with some redness; a

---

[6] When referring to the Title VII Lawsuits, the Court refers to the pagination assigned by the Electronic Filing System.

wound on the left side of Plaintiff's nose; a quarter-inch wound to the face; a one-inch scratch on the neck; and, reddening of the right eye sclera, but denial of blurred vision. Id. at 5. The nurse noted that Plaintiff complained of left ankle pain, but there was no discoloration or swelling. Id. The nurse found Plaintiff's gait steady, without a limp. Id. The physician, J. Aviles, M.D., reviewed the Emergency Room Record on May 10, 2011. Id. at 4-5.

The Chronological Record of Health Care states that Plaintiff complained of eye, ear, and ankle pain on June 1, 2011. Id. at 2. Medical staff recorded that Plaintiff denied recent trauma. Id. Medical staff recorded mild edema to the left ankle, but Plaintiff managed full weight bearing on the ankle without difficulty. Id. On June 3, 2011, Plaintiff returned to the clinic complaining of an earache and mild soreness of his left ankle from a recent incident at UCI, and he expressed concern about his eyes. Id. at 1. The Physician Assistant examined Plaintiff, finding inflammation of the outer ear (otitis externa), a hematoma (old eccymosis without swelling on right lower eyelid area), clear conjunctiva and schlera, the eye lens intact, and no soft tissue or bony tenderness. Id.

In addition to his own Affidavit,[7] Plaintiff submitted three affidavits from fellow inmates. Plaintiff's Exhibit A (Doc. #122).

_____

[7] In his Affidavit, Plaintiff's Exhibit A (Doc. #122), Plaintiff reiterates the allegations presented in his Complaint.

- 25 -

Two of the affidavits are not dated.[8]  Id.  Reginald E. Symonette attests that inmates in O dormitory were frequently taken to the day room without restraints.  Id.  Of import, that is not the allegation in this case, as Plaintiff admits that both he and Ohlin were handcuffed behind their backs in the day room.  Lance Braham provides information concerning the screen in front of holding cells.  Id.  Since this case concerns a screen placed in front of the O-dormitory day room, this information is of limited or no value.  In a November 5, 2012 Affidavit, Derrick Grantley states that the white screen blocks the inmates in the O-dormitory day room from seeing out of the day room.  Id.  Defendants admit that the purpose of the screen is to block inmates from seeing female staff in the control room.  Grantley states that officers do not supervise the inmates in the day room and sometimes handcuffs are removed in the day room.  Id.  Again, in this instance, Plaintiff admits that both he and Ohlin were handcuffed behind their backs in the day room.  Additionally, it is undisputed that officers were in the process of escorting an inmate to his cell and returning to the day room at the time of this incident.

The record also shows that on April 27, 2009, while confined in U-dormitory at UCI, Plaintiff complained about inmates slipping out of handcuffs and attacking other inmates.  Plaintiff's Exhibit

---

[8] Pursuant to 28 U.S.C. § 1746, an unsworn declaration under penalty of perjury must be both signed and dated.  In this instance, the Affidavits of Reginald E. Symonette and Lance Braham are not dated.

J (Doc. #122), Inmate Request dated April 27, 2009.  On April 28, 2009, the Confinement Lieutenant, in denying the grievance, said that "[a]ll inmates that are pulled for group are fully restrained and supervised by security staff however there are times when the inmates do not comply with the rules as outlined." Id.  Plaintiff also complained to the warden, on April 21, 2009, that he feared a particular inmate on U-dormitory who threatened him and recently slipped out of his handcuffs, and Plaintiff asked for protection from this particular inmate.  Plaintiff's Exhibit J (Doc. #122), Inmate Request dated April 21, 2009.  In response, on April 29, 2009, the warden referred to a previous response.  Id.

Based upon the evidence set out above, the Court makes the following findings.  Plaintiff satisfies the physical injury requirement.  Also, there is a policy in place for the use of a screen to prevent sexual harassment of female staff.  Pursuant to the Code, the Security Operation provision requires that confinement cells be built to permit unobstructed observation by the staff; however, in this instance, the view into a confinement cell is not at issue.  Additionally, it provides that during escort, inmates are to be handcuffed behind their backs.  Pursuant to the Code, the Close Management section provides that inmates be restrained during day room activities, unless a senior correctional officer directs otherwise.  The Code also provides for security checks every thirty minutes, on an irregular schedule.  The officer stationed on the

quarterdeck of O-Dormitory provides additional monitoring of the day room.

The screens are placed at an angle to prevent inmates attending day room activities from viewing female staff in the control room. The screen does not, however, prevent the security staff from conducting their routine checks of the day room or prevent the officer stationed on the quarterdeck from monitoring the day room. The inmates in the day room are visible through the door and windows, without removal of the screen. In this instance, Plaintiff and inmate Ohlin were handcuffed behind their backs in the day room. Apparently, Ohlin managed to slip out of his handcuffs and attack Plaintiff. This incident occurred while officers were escorting an inmate back to his cell, a procedure that takes a few minutes, at most. Officer Altstatt, a staff member returning from escort duty, heard yelling coming from the day room and opened the day room door. Inmate Ohlin exited the day room with blood on his hands and shirt. Plaintiff told Officer Altstatt he was attacked. Officers Wood and Harden secured Ohlin in his cell, and then escorted Plaintiff to medical for treatment.

The record shows that in the past, Plaintiff and Ohlin attended day room activities without incident. It also shows that there was no prior notice to the officers or supervisory staff that Plaintiff feared Ohlin. The record further reflects that there was no negative history between Plaintiff and Ohlin. Defendants Reddish and Swain were not on notice of any problems between Plaintiff and

Ohlin (because there were none) or on notice that the O-dormitory day room was improperly supervised or inmates were improperly restrained.  It is documented that when Plaintiff complained that he was the victim of assault,  Altstatt immediately wrote a disciplinary report against Ohlin and referred the matter to the Shift Supervisor for investigation.  Furthermore, Ohlin was immediately secured in a cell, and staff escorted Plaintiff to medical for treatment.

Plaintiff has failed to allege facts showing a history of widespread failure to protect inmates, and a conclusory assertion of a history of failure to protect inmates is insufficient to put the officials on notice of an ongoing constitutional deprivation. See Doe v. School Bd. of Broward Cnty., Fla., 604 F.3d 1248, 1266 (11th Cir. 2010).  Furthermore, Plaintiff does not allege any facts that would establish that there was a history of failure to protect inmates at UCI that was "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990), cert. denied, 500 U.S. 933 (1991).

Additionally, any claim of negligent training and supervision is insufficient to state a claim of federal constitutional dimension.[9] See Harris v. Coweta Cnty., 21 F.3d 388, 393 (11th Cir.

_____

[9] To establish liability for negligent supervision or retention, a plaintiff must show that "the employer knows or should know of an employee's unfitness and fails to take further action such as 'investigating, discharge or reassignment.'" Malicki v. Doe, 814 So. 2d 347, 362 n.15 (Fla. 2002).  As noted above, there were policies in place, and the correctional officers abided by

- 29 -

1994) (noting that "[a]ccidents, mistakes, negligence, and medical malpractice are not 'constitutional violation[s] merely because the victim is a prisoner'") (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)); see also Rooney v. Watson, 101 F.3d 1378, 1380-81 (11th Cir. 1996) (stating that the alleged negligence does not transform a state tort claim into a constitutional deprivation), cert. denied, 522 U.S. 966 (1997); Cannon v. Taylor, 782 F.2d 947, 950 (11th Cir. 1986) (holding that negligence actions are actionable under state law, but do not rise to the level of a constitutional deprivation).

Finally, the officers responded appropriately to Plaintiff's claim that he was assaulted by Ohlin, and any contention otherwise is thoroughly contradicted by the record.  As previously stated, the uncontroverted evidence before the Court demonstrates that the FDOC has policies and procedures in effect concerning the use of a screen to protect female staff from sexual harassment by inmates; procedures and rules in effect to restrain inmates during escort and day room activities; procedures and rules in effect to monitor inmates in the day room; and a procedure in place to punish inmates who engage in conduct that is in violation of the institutional

---

these policies.  There is no evidence to support a finding that Defendants Reddish and Swain were negligent in their supervision of the officers.  The record shows a screen was in place to protect female staff from sexual harassment by inmates, inmates in the day room were handcuffed behind their backs pursuant to regulation, officers were monitoring the day room from the quarterdeck and through routine checks, an officer responded immediately to the attack when he heard yelling coming from the day room, officers secured inmate Ohlin in his cell, and officers escorted Plaintiff to medical for treatment.

rules.  Indeed, an officer wrote Ohlin a disciplinary report, and Ohlin received disciplinary sanctions for his actions on May 7, 2011.

Thus, the record before the Court shows that there were regulations in place to ensure the safety and security of the institution.  Additionally, there is a screen policy in place to protect female staff from lewd and lascivious exhibitions.  Finally, there are administrative regulations in place for punishing those inmates who attack other inmates.

The Court recognizes that the extra-precaution of restraining CMII inmates with their hands behind their backs was undertaken during escort and day room activities.  Nevertheless, in this instance, Ohlin managed to slip out of his handcuffs, even though his hands were cuffed behind his back.  This, however, does not signify failure to protect by correctional staff.  Also, the fact that moments, or perhaps a few minutes, may have passed during Ohlin's day room assault on Plaintiff, does not amount to a failure to protect as evidenced by the fact that an officer returning from escort duties promptly responded to yelling coming from the day room.

As to Plaintiff's allegation that Defendants failed to enforce or adopt measures to ensure a safe environment free from victimization, this contention is belied by the record.  Indeed, the record shows that in an effort to ensure an harassment free environment, free from victimization of female staff by male

inmates, UCI adopted a screen policy requiring a screen to shield female staff from view by inmates.  The policy and procedures requiring routine security checks of the day room, monitoring of the day room by the quarterdeck officer, and handcuffing of inmates behind their backs during day room activities, are all measures adopted to promote a safe environment.  Finally, as attested by correctional staff, officers are able to view and hear the inmates in the day room through the windows and door, also promoting a more secure environment.

All of these safety measures, however, are balanced with an attempt to provide CMII inmates with some privileges, like day room activities.  In this instance, Plaintiff and Ohlin achieved CMII status, giving them the privilege of attending day room activities, restrained, but not hobbled in leg irons, waist chains and black boxes.  Inmate Ohlin abused that privilege, and as a result, he faced and received disciplinary sanctions.

Despite all of the measures undertaken to ensure a safe, relaxing environment in the day room, Ohlin slipped out of his handcuffs and attacked Plaintiff.  However, an officer on the wing promptly responded to yelling coming from the day room, opened the door, and Ohlin exited the room with blood on his hands and shirt, denying involvement in the attack.  Thereafter, officers escorted Ohlin to his cell and Plaintiff to medical for treatment.

In conclusion, Defendants were not deliberately indifferent to the health and safety of Plaintiff.  Correctional officers

handcuffed Plaintiff and Ohlin behind their backs.  Correctional officers conducted routine inspections and tours of administrative confinement, and the quarterdeck officer monitored the day room. In order to prevent sexual harassment of female staff, correctional officers placed a shield in front of the day room to prevent inmates from seeing the control room female staff.  At the end of day room activities, officers escorted inmates back to their cells, a process which took, at most, a few minutes per inmate escort.  Although an escort officer did not respond in time to prevent the assault on Plaintiff, one escort officer heard yelling coming from the day room, and promptly returned to the day room to find Ohlin uninjured and Plaintiff injured.

Plaintiff's evidence is "insufficient to support the level of deliberate indifference and causal connection necessary" to hold Defendants personally responsible for Plaintiff's injuries.  Hale v. Tallapoosa Co., 50 F.3d 1579, 1582 (11th Cir. 1995).  Indeed, prisoners do not have to be "seen by jailers at all times." Popham v. City of Talladega, 908 F.2d 1561, 1565 (11th Cir. 1990) (per curiam).  Here, the policies and procedures and actions of Defendants do not evidence "a conscious or callous indifference" to Plaintiff's right to be free from cruel and unusual punishment. Abrams v. Hunter, 910 F.Supp. 620, 624 (M.D. Fla. 1995) (citations omitted).  This is not an instance where Plaintiff faced the constant threat of violence.  Plaintiff routinely attended day room activities at UCI without disruption, and this was an isolated

attack by a fellow inmate.   Based on the record before the Court, Defendants were not "subjectively aware of a substantial risk of serious harm" to Plaintiff.   Goodman v. Kimbrough, 718 F.3d 1325, 1334 (11th Cir. 2013).

## INJUNCTIVE RELIEF

Plaintiff is no longer confined at UCI.   Therefore, his claim for injunctive relief is moot.   See Motion for Summary Judgment at 7.

## QUALIFIED IMMUNITY

Defendants contend they are entitled to qualified immunity from monetary damages in their individual capacities.   The Eleventh Circuit has said:

> To receive qualified immunity, [a] public official must establish that he was engaged in a "discretionary function" at the time he committed the allegedly unlawful act. Holloman ex. rel. Holloman v. Harland, 370 F.3d 1252, 1263-64 (11th Cir. 2004) . . . . If the official demonstrates that he was engaged in a discretionary function, the burden shifts to the plaintiff to prove that the official is not entitled to qualified immunity. Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003). This requires plaintiff to satisfy the two-part test prescribed by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Under Saucier, a plaintiff must first show that the defendant violated a constitutional right and then demonstrate that the constitutional right was clearly established at the time of the alleged wrongful act. 533 U.S. at 201, 121 S.Ct. at 2156. If a court, after viewing all the evidence in the light most favorable to the plaintiff and drawing all inferences in his favor, determines that the plaintiff has satisfied these two

requirements, the defendant may not obtain
qualified immunity. <u>Holloman</u>, 370 F.3d at 1264.

<u>Bryant v. Jones</u>, 575 F.3d 1281, 1295 (11th Cir. 2009), <u>cert</u>. <u>denied</u>,
559 U.S. 940 (2010).  Following the United States Supreme Court's
decision in <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009), this
Court is "free to consider these elements in either sequence and to
decide the case on the basis of either element that is not
demonstrated."  <u>Youmans v. Gagnon</u>, 626 F.3d 557, 562 (11th Cir.
2010) (per curiam).

It is undisputed that Defendants were engaged in discretionary
functions during the events in question.  Defendants did not violate
Plaintiff's constitutional rights, as discussed above, and they
therefore are entitled to qualified immunity in their individual
capacities. <u>See</u> <u>Anderson v. City of Naples</u>, No. 12-10917, 2012 WL
6570895, at *4 (11th Cir. Dec. 17, 2012) (per curiam) (not selected
for publication in the Federal Reporter) (recognizing that qualified
immunity protects government officials engaged in discretionary
duties from suits in their individual capacities unless there is a
violation of a constitutional right and the right was clearly
established at the time of the alleged violation).

**CONCLUSION**

Based on all of the above, Defendants are entitled to summary
judgment, and judgment is due to be entered for Defendants and
against Plaintiff.  For all of the foregoing reasons, it is now
**ORDERED**:

- 35 -

1.    Defendants' March 26, 2013, Motion for Summary Judgment (Doc. #108) is **GRANTED**, and the **Clerk** shall enter judgment for Defendants and against Plaintiff Oliver.

2.    The **Clerk** shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 22nd day of October, 2013.


ROY B. DALTON, JR.
United States District Judge


sa 10/17
c:
Warren Oliver
Counsel of Record